UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

F. OTIS STEPHEN,

     Plaintiff,

v.                                                    Case No: 8:15-cv-556-T-36AAS

H. LEE MOFFITT CANCER CENTER
AND RESEARCH INSTITUTE LIFETIME
CANCER SCREENING CENTER, INC.,

     Defendant.
_____/

**<u>ORDER</u>**

This matter comes before the Court upon the Plaintiff's Motion for Summary Judgment (Doc. 73), Defendant's Response in Opposition (Doc. 83), Plaintiff's reply (Doc. 97), Defendant's Motion for Summary Judgment (Doc. 77), Plaintiff's amended response in opposition (Doc. 92)[1] and Defendant's reply (Doc. 108). Additionally, the Court has considered Defendant's Motion to Strike Portions of Plaintiff's Response to Motion for Summary Judgment (Doc. 102) and Plaintiff's response in opposition (Doc. 109). Oral argument on the motions was held on February 17, 2017 (Doc. 126). Upon due consideration of the parties' submissions, including deposition transcripts, affidavits, memoranda of counsel, and exhibits attached thereto, and for the reasons that follow, the Court will DENY Plaintiff's Motion for Summary Judgment and GRANT Defendant's Motion for Summary Judgment. Defendant's Motion to Strike Portions of Plaintiff's Response to Motion for Summary Judgment will be DENIED.

---

[1] Plaintiff's original response in opposition to Defendant' Motion for Summary Judgment (Doc. 88) was amended by Doc. 92 to correct a scrivener's error.

## I. **STATEMENT OF FACTS**[2]

Plaintiff, F. Otis Stephen, who is black, began his employment with the H. Lee Moffitt Cancer Center and Research Institute, Inc. doing business as Moffitt Medical Group ("Moffitt") as an endoscopist and gastroenterologist on May 21, 2013, at an annual salary of $265,012.80. Stephen Dep.[3] at 10:2-9, 13:5-8, 15;18-24, 1:12-15; Doc. 25 at ¶ 13. The Chair of the Gastrointestinal Oncology Department, Dr. Mokenge Malafa, supervised Stephen. Doc. 105 at ¶ 2. Non-party H. Lee Moffitt Cancer Center and Research Institute Hospital, Inc. (the "Hospital") granted privileges to Stephen to work at the Hospital. O'Connor Aff.[4] ¶ 7. Moffitt placed Stephen on paid leave on November 1, 2013, after which he returned on November 11, 2013. But Moffitt ultimately terminated his employment on October 23, 2014. The following describes the series of incidents that occurred prior to Stephen's termination.

### a. **August 14, 2013 Procedure**

On August 14, 2013, Stephen was conducting an endoscopy procedure and was the physician in charge. Doc 105 at ¶ 3. The support staff included nurse anesthetist Christian Cleveland-Peck, nurse Melissa Rosa, and endoscopy technician Arnold Gallardo. Doc. 105 at ¶ 4. During the procedure Rosa used the term "nigger-rig" to describe fixing machinery that was not functioning properly during the procedure. Stephen Dep. 179:24-180:11. Lucy Armistead, Manager of Patient Care and Rosa's direct supervisor became aware of this incident and notified Nancy Bolyard, Director of Nursing for Perioperative Services. Dudley Aff.[5] at ¶ 25. On August

---

[2] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including stipulations of agreed material facts, depositions, affidavits and attachments thereto.
[3] Deposition of F. Otis Stephen. Doc. 89-1.
[4] Affidavit of Jane O'Connor. Doc. 78-5.
[5] Affidavit of Ashley Dudley. Doc. 78-3.

20, 2013, Bolyard e-mailed Stephen alerting him that she was aware of the incident, that she found that behavior unacceptable, and that she wanted to talk to Stephen about it before addressing it with Rosa. *Id*. Stephen responded, "I have no idea what you are talking about." *Id*. Bolyard then spoke to Stephen, who told her that the issue had been resolved. Stephen Dep. 181:6-16. Bolyard told Stephen that she was going to investigate the incident, although Stephen said there was no need. *Id*. at 181:16-17. Once the investigation was complete, Moffitt issued a Coaching & Counseling Report to Rosa relating to this incident. Dudley Aff. at ¶ 25.

### b. October 30, 2013 Procedure

On October 30, 2013, Stephen performed another endoscopy procedure. Gallardo, nurse anesthetist Lori Walz, and nurse Luz Diez were present. Stephen Dep. 29:4-12, 29:25-30:1, 64:5-20. During the procedure, several of those present participated in a heated and prolonged discussion involving race relations, incarceration, and capital punishment. Stephen Dep. 61-21-62:7; Doc. 105 at ¶ 8. Walz made a statement to the effect of "blacks are in prison because they commit all the crimes[.]" Stephen Dep. 77:24-80:18. Stephen said to Walz, while leaning forward and raising his voice: "do not bring that racist shit to me." Stephen Dep. 82:13-21, 83:20-23.

Afterwards, Gallardo, Diez, and Walz provided reports to Human Resources about the incident. Diez reported that Plaintiff lunged across the table towards Walz and said "[y]ou don't know the fuck about it." O'Connor Aff. ¶¶ 35-36. Walz reported that Stephen lunged at her with the endoscope in his hand and screamed "[y]ou don't know what the fuck you are talking about" and "[t]hat's why you don't know anything[;] because you're a white suburban bitch." Dudley Aff. ¶¶ 27-28. She stated that she felt scared and thought that Stephen was going to come across the table and strangle her. *Id*. Gallardo corroborated Walz and Rosa's accounts and stated that Stephen

called Walz a "white suburban bitch," that Walz was scared, and that if there had not been a bed between them Stephen would have leaped over at Walz. O'Connor Aff. at ¶¶ 35, 37.

Stephen attempted to report the incident to his supervisors Malafa and Scott the same day. His assistant scheduled a meeting with Stephen, Scott, and O'Connor for later that day. Stephen Aff. [6] at ¶ 9.

On October 31, 2013, Dr. Jonathan Lancaster, then Moffitt's President, Vice President Dr. Lee Green, and Jane O'Connor met with Stephen. Stephen Dep. 96:16-20, 99:21-24. During the meeting, Stephen admitted that he leaned forward and said "do not bring that racist shit to me." *Id.* at 99:21-102:25. Lancaster told Stephen that he would be placed on paid leave of absence, and that Moffitt would continue the investigation. Stephen Dep. 146:4-16, Ex. 5, 107:11-15. Stephen's scheduled procedures were postponed prior to the meeting. Stephen did not lose any pay or benefits and his paid time off continued to accrue. Stephen Dep. 146:20-25. Stephen requested that Moffitt interview nurse Sheila Homolya and Christian Cleveland-Peck claiming that both had personal knowledge regarding Gallardo's hostility towards Stephen. Stephen Aff. at ¶ 10. Moffitt did not interview them. *Id.* Walz was issued an Employee Counseling & Coaching Report for the incident. O'Connor Aff. at ¶ 38; Doc. 105 at ¶ 11.

On November 10, 2013, Stephen signed an Equal Employment Opportunity Commission ("EEOC") Charge of Discrimination (the "Charge") against Moffitt alleging "unequal terms and conditions of employment when it came to disciplinary actions due to race[,]" in violation of Title VII of the Civil Rights Act of 1964, as amended. Stephen Dep., Ex. 5, Doc. 89-2 at 15.

On November 14, 2013, Stephen received a letter from Dr. Malafa indicating that Moffitt would soon complete its investigation of the October 30, 2013 incident, his paid leave was

---

[6] Affidavit of F. Otis Stephen. Doc. 89-5.

concluded as of November 11, 2013, and his privileges were restored. Doc. 89-5 at 8. The letter indicated that Stephen was placed on leave "to de-escalate the situation and allow Moffitt Medical Group to begin its investigation of these complaints." *Id*. On December 3, 2013, Malafa issued a Final Written Warning ("FWW") to Stephen, regarding the October 30, 2013 incident, stating that "an emotionally charged conversation involving race escalated to an inappropriate level such that attention and focus on the patient and procedure may have been compromised." Stephen Dep. 110:24-111:10, Ex. 4.

On December 18, 2013, the Hospital informed Stephen that he had to participate in a confidential peer review process called a Focused Professional Practice Evaluation ("FPPE"). O'Connor Aff. at ¶ 39; Stephen Dep., Ex. 9. Gallardo filed a safety report based on Stephen's conduct on October 30, 2013, which prompted the FPPE. O'Connor Aff. at ¶ 39. The FPPE can result in a suspension of privileges, but no discipline was imposed as a result and Stephen maintained his privileges and continued working. O'Connor Aff. at ¶¶ 41, 42, 45; Doc. 105 at ¶¶ 13, 15. The letter informing Stephen of the FPPE indicated that there were "certain behavioral, tardiness, and coverage issues related to [his] Medical Staff membership" which caused the Hospital to conclude that the circumstances warranted a FPPE for three months. Stephen Dep., Ex. 9; Doc. 89-2 at 25.

### c. September 29, 2014 Procedure

On September 29, 2014, Stephen conducted a procedure with nurse Rosa, endoscopy technician Noemi Cruz, and anesthesia technician Victor Delgado. Stephen Dep. 160:17-25, Doc. 105 ¶ 14. During the procedure the individuals discussed the possibility of someone getting shot. Rosa and Cruz reported that Stephen told them that he would "pop a cap in your ass." They also reported that Stephen touched Cruz's arm, which Stephen admits. Stephen does not specifically

recall making the "pop a cap" statement. But he asserts that if he did, it would have been in jest and directed towards Delgado, not Cruz. Stephen Dep. at 161:24-162:4; Dudley Aff. at ¶¶ 18-20.

Moffitt conducted interviews of Rosa, Cruz, and Delgado. Quidgley Aff.[7] ¶¶ 8-10. Cruz reported that Stephen pointed at her and said "I have a gun too and I would pop a cap on your ass." *Id*. at ¶ 8. Cruz reported that Stephen forcefully grabbed her arm during the procedure and that he told Rosa he would "whoop [her] ass." *Id*. Rosa reported that Stephen grabbed Cruz's arm during the procedure, *id*. at ¶ 9; told Cruz "I will pop a cap in your ass" and told Rosa he would "whoop [her] ass." Beasley Aff.[8] at ¶¶ 7-8. Delgado reported that there was a conversation about guns and he could not recall the specific comments Stephen made, but that the comments attributed to Stephen were the kinds of comments Stephen would make.[9] Quidgley Aff. at ¶ 10.

On October 7, 2014, Ashley Dudley, Director of Strategic Workforce Management met with Stephen to hear his version of the September 29, 2014 events. Stephen Dep. 159:6-13; Dudley Aff. at ¶ 17. Clifton Scott was present and Green appeared by phone. Stephen Dep. at 159:14-20. Stephen described, from his perspective, what happened in the procedure room on September 29, 2014. *Id*. at 159:10-160:16; Doc. 105 at ¶ 17. He explained that the conversation was in jest, admitted that the conversation was about guns and someone getting shot, and stated that he braced Cruz's arm with three fingers to prevent her from bumping into him during the procedure. *Id*. at 161:24-162:4, 163:13-25, 164:1-8; Dudley Aff. at ¶¶ 21-23.

---

[7] Affidavit of Kenneth Quidgley. Doc. 78-6.
[8] Affidavit of Diane Beasley. Doc. 78-4.
[9] Delgado testified at his deposition that he was certain that he did not see Stephen touch Cruz and if asked, he would have told human resources that the procedure proceeded without incident, and Stephen was not threatening to any staff member during the September 29, 2014 procedure. *See* Deposition of Victor Manuel Delgado Rolon (Doc. 89-4) at 31:22-25, 38:10-17, 47:25-48:3.

Dr. Doug Letson, Moffitt's Physician-in-Chief, concluded that Stephen's statements constituted a tacit admission that he made a threat of violence (whether to Cruz or Delgado) in the workplace and decided that Stephen violated the "zero tolerance policy" against threats. Letson Aff.[10] at ¶¶ 8-9. Letson also took Stephen's admission that he braced Cruz's arm as support for his conclusion that he touched Cruz in an offensive manner which also violated the policy. *Id.* at ¶¶ 8, 10. And overall Letson found Rosa and Cruz's account of the September 29, 2014 incident credible. Letson decided to terminate Stephen based on these violations. *Id.* at ¶ 11. Stephen was terminated on October 23, 2014.

Stephen again contacted the EEOC. Stephen Dep. 234:15-235:6, Ex. 8. On December 17, 2014, Stephen received a letter from the EEOC which referenced Stephen's conversation and correspondence in which he alleged employment discrimination against Moffitt based on his termination. The letter indicated that in order for the EEOC to investigate the claim he should file a charge of discrimination pursuant to Title VII of the Civil Rights Act of 1964. Stephen Dep. at 235:11-25, 236:1-20, Ex. 8, Doc. 89-2 at 22-23. Stephen did not file a second charge of discrimination and requested that the EEOC refrain from investigating the matter further. Stephen Dep. at 236:21-237:2; 237:12-19. Accordingly, the EEOC did not investigate the termination claim. *Id.* at 237:21-25.

Stephen brings claims for violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e(2) and (3)(a) *et seq.* ("Title VII"), the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981"), and the Florida Civil Rights Act, Fla. Stat. § 760.01 *et seq.* ("FCRA"). He asserts that Moffitt discriminated against him based on his race and that he was the subject of disparate treatment, harassment, retaliation and a hostile work environment. Stephen seeks

---

[10] Affidavit of Doug Letson, M.D. Doc. 78-2.

equitable relief, including back pay and front pay, compensatory damages, punitive damages, attorneys' fees, and costs.

## II.  LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex, 477 U.S. at 323; Hickson Corp. v. N. Crossarm Co*., 357 F.3d 1256, 1259–60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id*. at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. However, a party cannot defeat summary judgment by relying upon conclusory allegations. *See Hill v. Oil Dri Corp. of Ga*., 198 Fed. App'x 852, 858 (11th Cir. 2006).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of

whether either of the parties deserves judgment as a matter of law on the facts that are not disputed.

*Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must

consider each motion on its own merits, resolving all reasonable inferences against the party whose

motion is under consideration. *Id*. The Eleventh Circuit has explained that "[c]ross-motions for

summary judgment will not, in themselves, warrant the court in granting summary judgment unless

one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed."

*United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (quoting *Bricklayers Int'l Union,*

*Local 15 v. Stuart Plastering Co*., 512 F.2d 1017 (5th Cir. 1975)). Cross-motions may, however,

be probative of the absence of a factual dispute where they reflect general agreement by the parties

as to the controlling legal theories and material facts. *Id*. at 1555-56.

## III.   DISCUSSION

Stephen moves for partial summary judgment on his discriminatory compensation claim

under § 1981 only. He argues that he has produced evidence that establishes a rebuttable

presumption of discrimination, and Moffitt has not adduced sufficient evidence to rebut the

presumption. For the reasons stated in this Order, the Court will deny Plaintiff's motion.

Defendant moves for summary judgment on all claims. It argues that Stephen's claims are

based on speculation and conjecture and he is unable to provide any evidence that any adverse

action was motivated by race or protected activity. Specifically, Moffitt argues that Stephen does

not make out a prima facie case of discrimination or retaliation because two of the alleged adverse

actions, his paid administrative leave and FWW, were not materially adverse.[11]   To the extent the

Court finds these actions to be adverse, Moffitt argues that it has proffered legitimate non-

discriminatory and non-retaliatory reasons for all three actions which Stephen is unable to show

---

[11] Moffitt concedes that the discharge was an adverse action. Doc. 77 at 14.

are pretextual. And, Moffitt argues, Stephen has not produced a proper comparator, either someone who replaced him or received more favorable treatment who is outside of his protected class. Further, Moffitt argues, Stephen cannot show a temporal proximity between his Charge and the alleged adverse actions sufficient to infer retaliation. Finally, Moffitt argues that Plaintiff's miscellaneous allegations of slights and disparate treatment by other doctors, nurses, support staff, and the administration are insufficient to support his claims of racial discrimination and retaliation.

Title VII prohibits an employer from discriminating on the basis of an individual's race. 42 U.S.C. § 2000e–2(a). The FCRA likewise prohibits employment discrimination on the basis of race. *See* Fla. Stat. § 760.10; *Grant v. Miami-Dade Cty. Water & Sewer Dep't*, 636 Fed. Appx 462, 463 (11th Cir. 2015) (noting that the FCRA uses the same framework as Title VII in discrimination cases). Finally, § 1981 grants all persons, regardless of race, the equal right to make and enforce contracts. Except as noted below, the elements of discrimination and retaliation claims under § 1981 are the same as under Title VII. *Rice–Lamar v. City of Fort Lauderdale, Fla.*, 232 F.3d 836, 843 n. 11 (11th Cir. 2000) (discrimination); *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1258 (11th Cir. 2012) (retaliation).

### a. Abandoned Claims

At oral argument, Stephen abandoned his summary judgment motion as to retaliation, conceding that Dr. Mokenge Malafa's affidavit, Doc. 83-1, created a genuine issue of material fact for trial precluding judgment in his favor. He also abandoned his harassment claim. The Court need not address these issues.

### b. Exhaustion of Administrative Remedies

Plaintiff must exhaust administrative remedies before filing suit under Title VII or the FCRA. *See* 42 U.S.C. § 2000e-5(e); Fla. Stat. § 760.11. He must file a charge, *see* 42 U.S.C. §

2000e-5(e), Fla. Stat. § 760.11(1), which must "be in writing under oath or affirmation," 42 U.S.C. § 2000e-5(b), or the statutes bar the claim. *Vason v. City of Montgomery, Ala.*, 240 F.3d 905, 907 (11th Cir. 2001); *Miller v. Florida Hosp. Waterman*, 5:13-CV-249-OC-10PRL, 2013 WL 5566063, at *2 (M.D. Fla. Oct. 8, 2013) (citing Fla. Stat. §§ 760.07, 760.11) ("Both Title VII and the FCRA require as a prerequisite to filing a lawsuit that the plaintiff timely file a charge of discrimination with the appropriate administrative agency—either the EEOC or the Florida Commission on Human Rights ("FCHR").")." A failure to cooperate with the investigating agency also bars the plaintiff's claims. *Crawford v. Babbitt*, 186 F.3d 1322, 1326-27 (11th Cir. 1999).

Here, Stephen did not sign and return a second charge of discrimination alleging wrongful discharge, and specifically requested that the EEOC not investigate it. Accordingly, Stephen failed to exhaust his administrative remedies as to his discharge claims, and summary judgment will be granted to Moffitt on his discharge claims under Title VII and the FCRA. But since § 1981 claims do not require exhaustion of remedies, the Court will analyze his discriminatory discharge claim under that statute.[12]

### c. Defendant's Motion to Strike Portions of Plaintiff's Response to Motion for Summary Judgment

Moffitt's motion takes issue with Stephen's disregard of the page limit and line spacing requirements of this Court's Case Management and Scheduling Order ("CMSO") (Doc. 26) and the Middle District of Florida's Local Rules and improper incorporation of arguments from his

---

[12] At oral argument, Plaintiff's counsel proffered evidence that Stephen relied on the EEOC's representation that it would issue a second "no cause" finding if he filed a second charge of discrimination because his second charge relied on the same series of events. Counsel otherwise argued that the discrimination and retaliation related to a "continuing series of events" which did not require a second charge for the termination, and that Moffitt was on notice that Stephen intended to file a second charge. Counsel points to no evidence in the record to support this argument. The Court will not consider this argument for lack of record evidence and is, otherwise, unpersuaded by it.

Motion to Strike the Affidavits of Diane Evans and Kenneth Quidgley. *See* Doc. 92 at ¶ 10(c) (i) (referencing Doc. 91). And Moffitt argues that in his Amended Response to the Motion for Summary Judgment, Stephen makes several arguments and factual assertions that are unsupported by proper record citations.

Federal Rule of Civil Procedure 56 requires that a party asserting that "a fact cannot be or is genuinely disputed must support the assertion by: citing particular parts of materials in the record…; or showing that the materials cited do not establish the absence or presence of a genuine dispute…." Fed.R.Civ.P. 56(c)(1)(A)-(B). Further Section H(1) of the CMSO requires that each party opposing a motion for summary judgment file and serve a legal memorandum which contains citation of authorities, specific material facts to which the opposing party contends there exists a genuine issue for trial, and "pinpoint citations to the pages and lines of the record supporting each material fact." Doc. 26 at 6. "General references to a deposition are inadequate." *Id*.

Stephen argues that he did comply with the CMSO because Section C of his Amended Response to Defendant's Motion for Summary Judgment contains more than ten pages of discussion, including pinpoint citations to the record, which specify the material facts that create a genuine issue for trial. And, Stephen argues, the specific statements with which Moffitt takes issue are mostly from the preliminary statement which Stephen designates as a "Factual Synopsis" in the pleading. He argues that every sentence need not have a pinpoint citation, particularly if the issue was addressed in another section of the pleading. Stephen also argues that he complied with the Local Rules and the CMSO's page and line requirements. To the extent that he inadvertently

defied them, he argues that there is no prejudice to Moffitt. Lastly, he argues that Moffitt's motion is essentially a reply brief, and the Court should construe it as such. [13]

The Court agrees with Defendant that the Plaintiff's Amended Response in Opposition to the Defendant's Motion for Summary Judgment (Doc. 92) is replete with assertions that are not supported by any record citation. *See, e.g.* Doc. 92 at 2 (stating that Plaintiff "was reported by Rosa and endoscopy technician Arnold Gallardo" and "was held responsible by his supervisor, Dr. Mokenge Malafa, for Rosa's use of the inappropriate term."). But, the Court also views some of the statements as legal argument, and not issues of fact requiring pinpoint citations. *See*, *e.g*., *id.* at 2 ("[Plaintiff] presents extensive circumstantial evidence that creates a triable issue of fact under the convincing mosaic theory…"; "Moffitt's 'asserted justification for its multiple adverse employment actions are false, and, more significantly, unreasonable.' ").

Although the Court agrees with Defendant that Stephen did not strictly adhere to the line spacing and page requirements and the response in opposition lacks proper record citations, striking is a harsh remedy which is not appropriate in this case. *See Quality Inns Int'l, Inc. v. Tampa Motel Assocs., Ltd.*, 154 F.R.D. 283, 287 (M.D. Fla. 1994) ("Motions to strike are ... infrequently granted. The determination of whether a motion to strike should be granted is within the trial court's discretion.").  Rather, the Court will simply not consider facts that do not include record citations, as required by the Federal Rules of Civil Procedure and the CMSO.

---

[13] Although Moffitt argued that it could not have a fair opportunity to file a reply because it could not determine the bases for Stephen's assertions, *see* Doc. 102 at 8; it ultimately filed a reply brief, Doc. 108, as permitted by the CMSO.

### d. Discrimination Claims: Discriminatory Compensation, Suspension and Discharge

Claims for unlawful racial discrimination based upon circumstantial evidence brought under Title VII, § 1981, and the FCRA are all analyzed under the *McDonnell Douglas*[14] framework using the same evidentiary requirements. *See Rioux v. City of Atlanta, Ga.,* 520 F.3d 1269, 1275 (11th Cir. 2008) (Title VII); *Smith v. Lockheed-Martin Corp.,* 644 F.3d 1321, 1325 (11th Cir. 2011) (§ 1981); *St. Louis v. Florida Int'l Univ.,* 60 So. 3d 455, 458–59 (Fla. 3d DCA 2011) (FCRA).

To establish a circumstantial prima facie case of race discrimination based on disparate treatment, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment decision; and (4) his employer treated similarly situated employees outside his classification more favorably. *See Vessels v. Atlanta Independent School Sys.,* 408 F.3d 763, 768 (11th Cir. 2005).

Further, when a plaintiff alleges racial bias in the application of discipline for violation of work rules he must also show "either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct." *King v. Butts County Ga.,* 576 Fed. Appx. 923, 928 (11th Cir. 2014) (quoting *Jones v. Gerwens,* 874 F.2d 1534, 1540 (11th Cir. 1989)). "[A]n employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation." *Id.*

---

[14] *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d. 668 (1973).

In order to establish a prima facie case of intentional compensation discrimination based on race, the plaintiff must establish that: (1) he belongs to a racial minority; (2) he received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) he was qualified to receive the higher wage. *Hill v. Emory U.*, 346 Fed. Appx. 390, 395 (11th Cir. 2009) (citing *MacPherson v. Univ. of Montevallo*, 922 F.2d 766, 774 (11th Cir. 1991)).

As to the adverse action prong of the prima facie case, the Eleventh Circuit has noted that "not all conduct by an employer negatively affecting an employee constitutes [an] adverse employment action." *Davis v. Town of Lake Park, Fla*., 245 F.3d 1232, 1238 (11th Cir. 2001). "[T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment." *Id*. at 1239 (internal citations omitted). "[T]he employment action must be materially adverse as viewed by a reasonable person in the circumstances," and "the employee's subjective view . . . is not controlling." *Id*.

An employee identified by the plaintiff as a comparator "must be similarly situated in all relevant respects." *Wilson*, 376 F.3d at 1091. When faced with a proposed comparator for a discriminatory discharge claim, the Court must consider "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Id*.

"Once the plaintiff has made out the elements of the prima facie case, the burden shifts to the employer to articulate a non-discriminatory basis for its employment action." *Vessels*, 408 F.3d

at 768 (citation omitted). "If the employer meets this burden, the inference of discrimination drops out of the case entirely, and the plaintiff has the opportunity to show by a preponderance of the evidence that the proffered reasons were pretextual." *Id*. (citation omitted).

To show pretext, Stephen must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (citation omitted). "A plaintiff is not allowed to recast an employer's proffered non-discriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and he cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transp*., 229 F.3d 1012, 1030 (11th Cir. 2000).

### i. *Stephen makes out a prima facie case for disparate pay but has not established pretext*

The parties do not dispute that Stephen is part of a protected class and was otherwise qualified for his position. Stephen argues that Mark Friedman, who is a white gastroenterologist hired after him, is a valid comparator. The Court agrees. Both Stephen and Friedman were hired as Assistant Members of the Department of Gastroenterology. *See* Doc. 73-1. On May 21, 2013, Moffitt hired Stephen at a salary of $265,012.80. Friedman's starting salary on July 2, 2014, was $275,000. Doc. 73-3 at 3. They were hired for the same position which meant that they had substantially similar work responsibilities. *See* Doc. 89-2 at 61. At his time of hire Stephen had 16 years as a doctor and 11 years as an endoscopist. Stephen Dep. at 73:8-12. He had an expertise in deep small bowel endoscopy and was recruited to Moffitt to perform procedures on patients who had problems or needed endoscopic therapy of the small bowel. *Id*. at 16:16-19. Stephen also had

five more years of experience than Friedman. Doc. 73-3 at 3. O'Connor recommended adjusting Stephen's salary upwards of 10% to $302,500, before the annual market review. Doc. 73-3 at 3. It did not happen as Stephen was terminated prior to the market review. Doc. 22 at ¶ 58. Plaintiff makes out a prima facie case for discrimination on the basis of disparate pay.

As its reason for the difference in compensation between Friedman and Stephen, Moffitt provides evidence that a recruiter working for Moffitt mistakenly stated a salary to Friedman that was greater than should have been provided. Malafa Aff.[15] at ¶ 12. *See also* O'Connor Aff. at ¶ 22. The recruiter stated a salary of $275,000. *Id*. Friedman relied upon the greater stated salary in accepting Moffitt's offer of employment. Malafa Aff. at ¶ 13. Malafa, who along with Dr. Jonathan Lancaster and Dr. Doug Letson, determined the hiring salary for Endoscopists, decided to honor the salary that had been offered and hired Friedman at a greater initial salary than Stephen and *all* of Moffitt's Endoscopists. *Id*. at ¶¶ 7, 14, 16. Further, Malafa stated that race was not a factor in setting Friedman's salary. *Id.* at ¶ 16. Moffitt has proffered a legitimate non-discriminatory reason for the difference in compensation between Friedman and Stephen, namely that the recruiter mistakenly quoted a higher rate of pay to Friedman, which Malafa decided to honor during the salary negotiations. *See also* O'Connor Aff. at ¶ 39.

Stephen argues that Moffitt's legitimate non-discriminatory reason is pretextual because Moffitt was aware of the wage disparity and did nothing and Moffitt terminated Stephen a day before he would have become eligible for an incentive bonus.[16] Malafa explains that annual

---

[15] Affidavit of Mokenge Malafa. Doc. 83-1.

[16] Stephen also contends that O'Connor's email dated April 4, 2014 (Doc. 106-1) conflicts with her affidavit (Doc. 78-5) and supports his argument regarding pretext. The complete email trail at Doc 106-1 shows that a misunderstanding occurred regarding Friedman's starting salary. It appears that because Friedman was, at some point, offered a higher starting salary, Malafa made a decision to honor that salary.

adjustments for the group of Endoscopists he supervised, including Stephen and Friedman, were scheduled to be made on October 30, 2014. Malafa Aff. at ¶ 17. He was considering whether market adjustments should be made to Stephen's salary in light of Friedman's higher salary. However, Stephen was terminated before the annual adjustments occurred. *Id*. at ¶¶ 18-20. *See also* O'Connor Aff. at ¶¶ 28-33. Stephen presents no evidence to show that Moffitt's proffered reason was false and that the real reason for the pay disparity was race. In fact at his deposition, Stephen stated that he had no basis for claiming that race was the reason that Friedman was hired at a higher rate. Stephen Dep. 319:8-15.  As the evidence before this Court does not establish that the disparity in pay between Stephen and Friedman had anything to do with race, Plaintiff's motion for summary judgment will be denied and Defendant's motion for summary judgment will be granted on this claim.

> ## ii.  *Stephen does not make out a prima facie case of discrimination based on his suspension and FPPE.*

The parties do not dispute that Stephen is part of a protected class and was otherwise qualified for his position. Moffitt argues that Stephen's suspension is not an adverse action because he continued to receive pay and accrue benefits. Moffitt relies on several out of circuit cases in support of its argument. *See, e.g*., *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 787 (7th Cir. 2007) (paid administrative leave pending investigation does not constitute materially adverse action under *Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)*); *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) ("[A] suspension with pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action."); *Lentz v. City of Cleveland*, No. 07–4385, 2009 WL 1563433, at *15 (6th Cir. June 4, 2009) (administrative leave pending an investigation not an adverse employment action).

Stephen argues that the adverse effect on him was the negative perception created by suspending only him after the incident. Upon his return from the suspension, Stephen reports that the other staff members treated and viewed him with disdain, and otherwise presumed he was the wrongdoer and Walz was permitted to spread her version of events without rebuttal. Stephen Dep. 147:13-148:9. Stephen also cites to an out of circuit case for the proposition that suspension with pay can be materially adverse; however, it is distinguishable. In *Perez v. Brain*, LACV1403911JAKAGRX, 2016 WL 607770, at *12 (C.D. Cal. Jan. 8, 2016), *reconsideration denied*, LACV1403911JAKAGRX, 2016 WL 4059689 (C.D. Cal. July 25, 2016), the court discussed paid administrative leave in the context of a retaliation claim by an employee under ERISA, 29 U.S.C. § 1140, where the employee was barred from interviewing and participating in review activities in her department while suspended. But her inability to participate in those activities led to her termination which made the suspension materially adverse.

The Eleventh Circuit has held in some circumstances that an unpaid suspension "represents an adverse employment action." *See McMillan v. Fulton Cty. Gov't*, 349 Fed. Appx. 440, 442 (11th Cir. 2009) (per curiam) (thirty day suspension without pay materially adverse). Here, Stephen was suspended with pay, while Moffitt continued its investigation into the October 31, 2013 incident. As reflected in the affidavit of the decision maker, Doug Letson, Stephen's suspension did not lead to his discharge. *See* Letson Aff. at ¶¶ 8-13.

Stephen has not demonstrated that the suspension was materially adverse to meet his burden to establish a prima facie case. Stephen did not suffer a serious and material change in the terms, condition, or privileges of employment as a result of the suspension. Even if he presented sufficient evidence to establish a prima facie case, he still fails to establish pretext. Stephen argues that Moffitt's contradictory statements regarding why he was put on suspension and when the

investigation actually commenced suggest that the proffered legitimate non-discriminatory reasons are pretextual. Specifically, he points to his November 14, 2013 reinstatement letter which stated that he was placed on administrative leave to de-escalate the situation, and "allow Moffitt Medical Group to *begin* its investigation of [the] complaints." Doc. 89-5 at 8 (emphasis added). And Stephen argues that Walz is a valid comparator and she was put on suspension only after an investigation into her misconduct, not prior. But Walz's actions were not sufficiently similar to Stephen's actions. It was Stephen who engaged in a heated discussion during a patient procedure, and, according to witnesses, lunged across the procedure table toward a nurse anesthetist and called her a bitch. Stephen has not offered evidence that Moffitt's proffered reasons are false or that the real reason for the suspension was race. Instead, it is clear that Stephen disagrees with how Moffitt handled the investigation of this incident.

Lastly, the Hospital, not Moffitt, implemented the FPPE. There is no evidence to suggest that the action should somehow be imputed to Moffitt.[17] It, therefore, is not an adverse action upon which Stephen can rely for his prima facie case.

### iii. *Stephen does not make out a prima facie case of discrimination based on his discharge claim*

The discharge claim is analyzed solely under § 1981 due to Stephen's failure to exhaust his administrative remedies with the EEOC. *Price v. M & H Valve Co*., 177 Fed. Appx. 1, 9 (11th Cir. 2006) (citing *Caldwell v. Nat'l Brewing Co*., 443 F.2d 1044, 1046 (5th Cir.1971) ("[A] plaintiff is not required to exhaust his administrative remedies before filing a § 1981 action in federal court."). Stephen has met his burden to show that his discharge is an adverse action, which Moffitt

---

[17] Although Stephen argues that the FPPE was alluded to in the suspension letter from Malafa, the Hospital sent a separate letter to Stephen informing him of the FPPE. *See* Docs. 89-5 at 8, 89-2 at 25.

does not dispute. But Moffitt argues that Stephen is unable to produce a valid comparator and therefore does not present a prima facie case. Stephen contends that under the totality of the circumstances and evidence before the Court, no comparator is needed. And, he argues, that the Eleventh Circuit permits a prima facie case in the absence of a valid comparator where there is evidence of "discriminatory animus" by the employer, citing to *Coar v. Pemco Aroplez, Inc.*, 372 Fed. Appx. 1 (11th Cir. 2010) and *Murdick v. Catalina Marketing Corp.*, 496 F. Supp. 2d 1337, 1357 (M.D. Fla. 2007). Stephen's comparator evidence is inadmissible.[18] And even if the Court otherwise agreed with Stephen's analysis, on the record before this Court, Stephen has not presented sufficient evidence to establish discriminatory racial animus on the part of Moffitt. Therefore, Stephen has not presented a prima facie case of discriminatory discharge under § 1981.

Assuming *arguendo* that Stephen has presented a prima facie case, Moffitt has provided a legitimate non-discriminatory reason for the discharge. Specifically, Letson's affidavit establishes that Moffitt discharged Stephen for violating Moffitt's zero tolerance policies prohibiting violence and threats of violence. Letson Aff. at ¶10. Letson, the decision maker, also stated that he would have discharged Stephen regardless of other factors, *i.e.* Stephen's prior behavior or employment history. *Id*. at ¶13. Further, Stephen admitted to touching Cruz's arm and using threatening language against another employee, *i.e.* "pop a cap in your ass." Violation of a zero tolerance policy is a legitimate non-discriminatory reason for termination. *See Castillo v. Roche Laboratories, Inc.*, 467 Fed. Appx. 859, 864 (11th Cir. 2012) (employee's violation of employer's

---

[18] Stephen stated in his affidavit that he had personal knowledge that Dr. James Barthel was accused of inappropriately touching a nurse and subjected to an investigation, but not terminated or otherwise disciplined. *See* Stephen Aff. at ¶ 21. The Court struck the statement as lacking the proper foundation of personal knowledge. Doc. 128.

zero tolerance policy for falsified expense report deemed legitimate non-discriminatory and non-retaliatory reason for discharge which employee failed to show was pretextual).

Stephen argues that Moffitt's reasons for his discharge are pretextual because they have shifted their explanations several times, first referring to the workplace policies in the Conduct Guideline in the termination letter, then referring to the zero tolerance policy in litigation. Also, Stephen refers to the FWW, expressly incorporated into the termination letter by reference, which chastised him for failing to control the operating room to the point where attention and focus was diverted from the patient. Doc. 88 at 10. And Stephen argues that the threat and violence language in the policies require a showing of intent by Stephen and Moffitt has not shown that any existed; and no evidence in the record demonstrates that Moffitt actually enforces its zero tolerance policy. *Id*. at 11-12.

The Court disagrees. There is no evidence in this record to demonstrate that Moffitt's reasons were both false and based on Stephen's race. Stephen has not offered evidence that Moffitt more likely than not acted with a discriminatory motive, or that its proffered reasons are not credible. "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez v. Royal A. Developers, Inc*., 610 F.3d 1253, 1266 (11th Cir. 2010). The question is not whether it really was Stephen's fault that the conversations in the procedure room were inappropriate, or that the nurses and his assistants did not respect him because of his behavior or lack of management skills, or whether the nurses and other personnel were really scared of him, or whether his racially charged comments were threatening or insulting. The question is whether his employer was dissatisfied with him for these or other non-discriminatory reasons, even if mistakenly or unfairly

so, or instead merely used those complaints about Stephen as cover for discriminating against him because of his race.  The evidence before the Court does not establish the latter.

Section 1981 does not require the employer's needs and expectations to be objectively reasonable; it simply prohibits the employer from discriminating on the basis of race. The Court does not sit as a "super-personnel department," and it is not its role to second-guess an employer's business decisions as long as those decisions were not made with a discriminatory motive. *Chapman*, 229 F.3d at 1030. That is true "[n]o matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers." *Id.* (quotation marks and citations omitted); s*ee also Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984) ("[An] employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.").

Weak arguments and stray comments, as those highlighted by Stephen in this case, are also insufficient to create a genuine issue as to pretext. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) (employer would be entitled to judgment as a matter of law if plaintiff created "only a weak issue of fact" as to whether proffered reason was untrue, and there was "abundant and uncontroverted independent evidence that no discrimination had occurred"); *Rojas v. Florida*, 285 F.3d 1339, 1342-43 (11th Cir. 2002) (stray remark "isolated and unrelated to the challenged employment decision" was insufficient by itself to establish genuine fact issue on pretext).

And § 1981 permits a mixed motive defense. *Mabra v. United Food & Com. Workers Loc. Union No. 1996*, 176 F.3d 1357-58 (11th Cir. 1999). If an employer "can prove that, even if it had not taken [race and] gender into account, it would have come to the same decision regarding a

particular person[,]" then it has an affirmative defense to a cause of action for discrimination and retaliation under § 1981. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 242, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Moffitt's evidence that Stephen violated its zero tolerance policy against violence and threats of violence, even if only part of the reason for his discharge, suffices to defeat his claim. Further, Letson stated that he would have fired Stephen in spite of other factors.

The Court also summarily rejects Stephen's arguments that: Moffitt was "lying in wait," the punishment was too severe, Moffitt unnecessarily injected race considerations into its investigatory files, Moffitt does not actually believe that Stephen was a threat, and that the investigations were insufficient. These arguments are insufficient to raise a genuine issue of material fact to demonstrate that Moffitt's legitimate reasons were actually pretext for unlawful racial discrimination. And the "cat's paw" theory of liability does not apply in this case as Stephen points to possible animus from other colleagues not supervisors. *See Sims v. MVM, Inc*., 704 F.3d 1327, 1335 n. 6 (11th Cir. 2013) (" 'Cat's paw' theory of liability, also referred to as 'subordinate bias theory,' is liability seeking to hold an employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision.").

### e. Retaliation Claims

On November 10, 2013, Stephen signed an EEOC charge of discrimination against Moffitt, alleging "unequal terms and condition of [his] employment when it came to disciplinary actions due to [his] race." Doc. 89-2 at 15. Stephen alleges that Moffitt retaliated against him under Title VII, FCRA, and § 1981 by issuing a FWW and terminating his employment.

To make a prima facie case for retaliation, the plaintiff must show: 1) a statutorily protected expression; 2) an adverse employment action; 3) a causal link between the protected expression and the adverse action. *Sullivan v. Natl. R.R. Passenger Corp*., 170 F.3d 1056, 1059 (11th Cir.

1999); *Shedrick v. Dist. Bd. of Trustees of Miami-Dade College*, 941 F. Supp. 2d 1348, 1365 (S.D. Fla. 2013) (reciting the same elements for a retaliation claim under the FCRA). Statutorily protected activity includes (1) opposing any practice made an unlawful employment practice by Title VII and (2) making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing. 42 U.S.C. § 2000e–3(a). *See EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000).

To state a retaliation claim under § 1981, a plaintiff must allege a defendant retaliated against him because the plaintiff engaged in statutorily protected activity. *Jimenez v. Wellstar Health System*, 596 F.3d 1304, 1311 (11th Cir. 2010). "As with other statutory retaliation claims, such a claim under § 1981 requires that the protected activity involve the assertion of rights encompassed by the statute." *Id.* (upholding dismissal of retaliation claim under § 1981 because under Georgia law, a physician does not have either a contract interest or property interest in maintaining hospital privileges, thus suspension of those privileges did not implicate rights protected by § 1981). Therefore, to state a claim for retaliation pursuant to § 1981, the protected activity must have been the type that § 1981 was enacted to prevent *i.e.*, racial discrimination in the making and enforcement of contracts. *See Moore v. Grady Meml. Hosp. Corp.*, 834 F.3d 1168, 1176 (11th Cir. 2016).

For a retaliation claim, the adverse employment action prong requires the plaintiff to show that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68 (internal citations omitted). To meet this standard, the action must produce an "injury or harm[,]" and must constitute "material and substantial action[.]" *Cabrera v. Sec'y, Dep't of Transp.*, 468 F. App'x 939, 942 (11th Cir. 2012). "[The Eleventh Circuit] construe[s] the causal link element broadly so that a plaintiff

merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Smith v. City of Greensboro*, 647 Fed. Appx. 976, 983 (11th Cir. 2016) (quoting *Goldsmith v. Bagby Elevator Co., Inc*., 513 F.3d 1261, 1278 (11th Cir. 2008) (internal quotation marks omitted)). A plaintiff can satisfy this element by providing sufficient evidence of the employer's knowledge of the protected expression and that there was a close temporal proximity between this awareness and the adverse action. *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).

Once the plaintiff makes out a prima facie case, "the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." *Id*. (quoting *Raney v. Vinson Guard Service*, 120 F.3d 1192, 1196 (11th Cir. 1997)). If the defendant offers legitimate non-retaliatory reasons, the presumption of retaliation disappears. *Id*. The plaintiff must then show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct. *Id*.

### i. The FWW does not rise to the level of an adverse action

Stephen argues that Moffitt retaliated against him by issuing the FWW, an adverse action in itself and one that led to his discharge. Malafa issued the December 3, 2013 FWW based on the events that took place on October 30, 2013. Malafa testified that it was completely unrelated to Stephen's Charge, which was signed on November 10, 2013, and that he would have issued it regardless of the Charge. Malafa Aff. at ¶ 24. Although Stephen argues that the FWW led to his termination, the evidence shows that almost a year passed between the FWW and the discharge, and Letson stated that he would have discharged Stephen based on the September 2014 incident alone.

On this record, the Court finds that the FWW was not an "adverse action" because it did not materially alter the terms, conditions, or privileges of Stephen's employment. *See Barnett v. Athens Regional Medical Center Inc.*, 550 Fed. Appx. 711, 713–714 (11th Cir. 2013) ("[M]emoranda of reprimand or counseling that amount to no more than a mere scolding, without any following disciplinary action, do not rise to the level of adverse employment actions sufficient to satisfy the requirements of Title VII."). "The negative evaluation must actually lead to a material change in the terms or conditions of employment[.]" *Id. See also Melton v. Natl. Dairy LLC,* 705 F. Supp. 2d 1303, 1322 (M.D. Ala. 2010) (Employee Warning Notice that led to suspension was adverse employment action because it could affect pay).

And the Court agrees with Moffitt's argument that where an employer's course of conduct is already underway when protected activity occurs, a mere temporal relationship between protected activity and adverse action is insufficient to establish a nexus between the two. The events leading to the FWW were underway, as a result of the investigation onto the October 31, 2013 incident, prior to Stephen's Charge. *See Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1232 (11th Cir. 2006). *See also Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("We hold that, in a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation."). Stephen has not established a prima facie case of retaliation based on the FWW.

### ii. *Stephen's discharge was too remote from the filing of the Charge to create a causal link*

Stephen argues that the discharge was also retaliatory. Relying on *Higdon***,** Moffitt argues that when there is a substantial delay between the protected activity and the adverse action, the plaintiff needs additional evidence tending to show causation to survive summary judgment.

*Higdon* held that by itself a "three month period … does not allow a reasonable inference of a causal relation between the protected expression and the adverse action." 393 F.3d at 1221. In this case, there is almost a year between the Charge and Stephen's discharge, and an intervening act of misconduct, which Moffitt argues severs any nexus between the protected act and adverse action.

Stephen argues that the temporal gap is attributed to Moffitt's strategic decision to "lay in wait" to avoid legal liability as to retaliation. He relies on *Hamilton v. Gen. Elec. Co*., which held that "when an employer ... waits for a legal, legitimate reason to fortuitously materialize, and then uses it to cover up his true, longstanding motivations for firing the employee, the employer's actions constitute the very definition of pretext. " 556 F.3d 428, 436 (6th Cir. 2009) (internal quotation marks omitted). Stephen points to increased scrutiny from the moment Moffitt received the Charge which led him to infer his status with Moffitt was "tenuous." He also points to Malafa's FWW and internal e-mail correspondence indicating that Moffitt anticipated an "unexpected exit" based on "ongoing recent events" which Stephen argues references the October 31, 2013 incident and the suspension, investigation, and warning that followed. Doc. 88 at 16 (citing Doc. 90-4). The evidence before this Court does not indicate or suggest that Moffitt "lay in wait" to avoid legal liability as to retaliation.

Here, the temporal gap of almost one year is insufficient, alone, to create an inference of causation. And the additional evidence that Stephen points to relates to actions and e-mails from December 2013, approximately ten months before Stephen's discharge. Further, Stephen's intervening act of unconsented touching and stating that he would "pop a cap" in another co-worker, thereby violating the zero tolerance policy against workplace violence is sufficient to break the causal chain. *Henderson v. FedEx Express*, 442 Fed. Appx. 502, 506 (11th Cir. 2011) (holding that an intervening act of misconduct by the plaintiff can break the causal link between

the protected conduct and the adverse employment action). Stephen has not established a prima facie case of retaliation based on his discharge.

### iii. Stephen has not produced sufficient evidence to create a triable issue as to Moffitt's legitimate non-retaliatory reasons

To the extent Stephen could present a prima facie case of retaliation under Title VII, FCRA, and § 1981, Moffitt has met its burden to proffer a legitimate non-retaliatory reason for the FWW and discharge, *i.e.* Stephen's tacit admission that he allowed a heated argument to take place during a procedure, and that he made a threat to another employee, which violated the zero tolerance policy against violence, respectively. Malafa's and Letson's affidavits are unrefuted. Ultimately, besides failing to produce sufficient evidence to create a genuine issue of material fact to show that the reasons are pretextual, Stephen does not meet his burden to show that that the proffered reasons were false and the real reasons were his race.

## IV. Conclusion

Although not determinative of the outcome of this case, some of the comments and behavior by the medical staff in the middle of serious procedures is quite disturbing, particularly the cavalier use of the term "nigger-rig", discussions regarding shooting other people whether seriously or in jest, and other behavior. Nonetheless, the Court's function is not to act as a personnel review board for employment relations, but to ferret out discriminatory behavior that is driven by racial bias and animus. And to the extent an employee engages in protected activity, the Court acts as a gatekeeper to review claims and determine whether the evidence suggests that an employer illegally sought to discourage that protected activity.

Apparently Stephens did not get along with the medical staff at Moffitt and the Hospital for various reasons as documented in his Amended Complaint and his deposition. But Stephen's evidence does not suffice to meet his burden at summary judgment. To the extent he could establish

a prima facie case, Stephen did not proffer sufficient admissible evidence to create a genuine issue of material fact or demonstrate that Moffitt's legitimate non-discriminatory reasons for its actions were pretextual, and the real reason for all of its decisions was racial animus. As no genuine issues of material fact exist, Moffitt is entitled to summary judgment in its favor, as a matter of law, on all of Stephen's claims.

**Accordingly, it is**

**ORDERED AND ADJUDGED**:

1.      Plaintiff's Motion for Summary Judgment (Doc. 73) is **DENIED**.

2.      Defendant's Motion for Summary Judgment (Doc. 77) is **GRANTED**.

3.      Defendant's Motion to Strike Portions of Plaintiff's Response to Motion for Summary Judgment (Doc. 102) is **DENIED**.

4.      The Clerk is directed to enter judgment in favor of Defendant H. Lee Moffitt Cancer Center and Research Institute Lifetime Cancer Screening Center, Inc. doing business as Moffitt Medical Group and against Plaintiff, F. Otis Stephen.

5.      All other pending motions are denied as moot.

6.      The Clerk is directed to terminate all pending deadlines and close this case.

**DONE AND ORDERED** in Tampa, Florida on May 3, 2017.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any